In the Matter of the Application of LAWRENCE T. GRESSER, Petitioner, for a Peremptory Mandamus Order against JOHN P. O'BRIEN, Mayor of the City of New York, and Others, Constituting the Board of Estimate and Apportionment of Said City, Respondents.

Supreme Court, New York County. March 5, 1933.

*Laughlin, Gerard, Bowers & Halpin* [*Frank C. Laughlin* of counsel], for the petitioner.

*Arthur J. W. Hilly, Corporation Counsel* [*William E. C. Mayer* of counsel], opposed.

LEVY, J. This is an application for a peremptory order of mandamus to compel the respondents to make provision in the revised budget for the year 1933 for ninety per cent of the salary of the petitioner as fixed at the time of his appointment as a justice of the Court of Special Sessions in the City of New York. This he is willing to accept in full for that year, without prejudice to the right thereafter to claim that the attempted reduction of his salary to the sum of $15,040 from $17,500, fixed at the time of his appointment, was utterly null and void.

The petitioner was appointed a justice of the Court of Special Sessions in 1930. Three years prior thereto, by legislative enactment, the salary of the office was established at $17,500 per annum. This salary was originally included in the budget of the city for 1933. In December of last year the Legislature, at an extraordinary session, in recognition of the existence of an emergency in the financial affairs of the city, enacted chapters 636 and 637 of the Laws of 1932, permitting the reopening of the budget of 1933 and granting the local authorities the right to redetermine the salary of any official whose compensation was paid in whole or in part out of the city treasury. This power was granted in derogation of any existing general, special or local law fixing or protecting such salaries. From the application of the statute there were exempted the justices of the Supreme Court, First and Second Judicial Districts, the surrogates of the counties of New York, Kings, Queens and Bronx, and the judges of the Court of General Sessions.

Pursuant to the authority thus granted, the board of estimate and apportionment reduced the salary of the justices of the Court of Special Sessions by the sum of $2,460. Petitioner's grievance is that this action is without constitutional authority, because those justices are protected by section 19 of article 6 of the Constitution against a decrease in their salaries during their respective terms. The consideration of this question is not without embar-

rassment to this court, just as a similar situation involving the right of the government to levy income taxes on the salaries of Federal judges was to the Supreme Court of the United States in *Evans* v. *Gore* (253 U. S. 245), where Mr. Justice VAN DEVANTER thus expressed the feeling of the high court (at p. 247): " Because of the individual relation of the members of this court to the question, thus broadly stated, we cannot but regret that its solution falls to us; and this although each member has been paying the tax in respect of his salary voluntarily and in regular course. But jurisdiction of the present case cannot be declined or renounced. The plaintiff was entitled by law to invoke our decision on the question as respects his own compensation, in which no other judge can have any direct personal interest; and there was no other appellate tribunal to which under the law he could go."

As the petitioner is " entitled by law to invoke our decision," I shall endeavor, dispassionately and according to my best light, to meet the problem thus presented.

In his brief in opposition to the application, the corporation counsel would seem to intimate that in enacting the emergency salary laws the Legislature exercised a power which was justified, even though in ordinary times it would have been indefensible. If his observation was intended to enunciate the proposition that an emergency justifies the removal of constitutional safeguards, it is fallacious. Guaranties vouchsafed by organic law may not be overridden except as permitted by the Constitution itself. A fitting example of this is found in section 4 of article 1 of the State Constitution, which permits the suspension of the writ of habeas corpus only in cases of rebellion or invasion when the public safety may require it. The constitutional protection of judicial salaries cannot be invaded or suspended by the Legislature. The existence of a public emergency may sway the individual, prompted by high civic principles, to waive the constitutional guaranty, and such waiver may be effective according to its intent. (*Musco* v. *United Surety Co.*, 196 N. Y. 459.) He may, on the other hand, like a well-known character in Shakespeare, insist upon the strict performance of what is " nominated in the bond."

The great mass of our public servants holding high judicial office have voluntarily elected to contribute a substantial fraction of their salaries to relieve the stringency in the city treasury. The petitioner is willing to yield ten per cent of his salary, but he reserves the right, if this offer is accepted by the board of estimate and apportionment, to later claim that the attempted reduction of his salary is illegal and void. Construed in its most favorable light, the offer is merely a promise to accept a ten per cent reduction for

1933, coupled with a challenge of the legality of chapter 637 of the Laws of 1932, in so far as it affects the petitioner.

The issue is thus squarely presented as to whether the Legislature, in permitting the city authorities to reduce petitioner's compensation, violated the provisions of section 19 of article 6 of the Constitution. The portion of the section particularly pertinent is the first sentence, which provides that: " All judges, justices and surrogates shall receive for their services such compensation as is now or may hereafter be established by law, provided only that such compensation shall not be diminished during their respective terms of office." This provision, approved by the people at the general election held in 1925, and in effect January 1, 1926, has never been judicially construed. It has its roots in similar language contained in the Constitution of the United States, as well as in former Constitutions of this State. Petitioner contends that the decisions made with respect to a similar provision contained in the earlier documents are not controlling because of the different context in which it is embodied. Even if he is correct in that contention, a survey of its historical antecedents cannot but throw light upon its meaning in its present form and setting.

The source of the provision prohibiting the reduction of judicial salaries is found in section 1 of article 3 of the Federal Constitution, which reads as follows: " The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." No better authority on the purpose of this section can be found than Alexander Hamilton himself. Let us read his views in the *Federalist* (No. LXXIX [Lodge ed.], p. 491): " Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. The remark made in relation to the President is equally applicable here. In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.* And we can never hope to see realized in practice, the complete separation of the judicial from the legislative power, in any system which leaves the former dependent for pecuniary resources on the occasional grants of the latter. The enlightened friends to good government in every State, have seen cause to lament the want of precise and explicit precautions in the State constitutions on this head. Some of these indeed have declared that *permanent* salaries should be established for the judges; but

the experiment has in some instances shown that such expressions are not sufficiently definite·to preclude legislative evasions. Something still more positive and unequivocal has been evinced to be requisite. The plan of the convention accordingly has provided that the judges of the United States ' shall at *stated times* receive for their services a compensation which shall not be *diminished* during their continuance in office.'

" This, all circumstances considered, is the most eligible provision that could have been devised. It will readily be understood that the fluctuations in the value of money and in the state of society rendered a fixed rate of compensation in the Constitution inadmissible. What might be extravagant today, might in half a century become penurious and inadequate. It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations and circumstances, yet under such restrictions as to put it out of the power of that body to change the condition of the individual for the worse. A man may then be sure of the ground upon which he stands, and can never be deterred from his duty by the apprehension of being placed in a less eligible situation. The clause which has been quoted combines both advantages. The salaries of judicial officers may from time to time be altered, as occasion shall require, yet so as never to lessen the allowance with which any particular judge comes into office, in respect to him. It will be observed that a difference has been made by the convention between the compensation of the ·President and of the judges. That of the former can neither be increased nor diminished; that of the latter can only not be diminished. This probably arose from the difference in the duration of the respective offices. As the President is to be elected for no more than four years, it can rarely happen that an adequate salary, fixed at the commencement of that period, will not continue to be such to its end. But with regard to the judges who, if they behave properly, will be secured in their places for life, it may well happen, especially in the early stages of the government, that a stipend, which would be very sufficient at their first appointment, would become too small in the progress of their service.

" This provision for the support of the judges bears every mark of prudence and efficacy; and it may be safely affirmed that, together with the permanent tenure of their offices, it affords a better prospect of their independence than is discoverable in the constitutions of any of the States in regard to their own judges."

Chancellor KENT (1 Comm. 294) thus refers to the same subject: " The provision for the permanent support of the judges is well calculated, in addition to the tenure of their office, to give them the

requisite independence. It tends, also, to secure a succession of learned men on the bench, who, in consequence of a certain undiminished support, are enabled and induced to quit the lucrative pursuits of private business for the duties of that important station." KENT, obviously, is very emphatic in his praise of the provision for permanence of tenure and certainty of compensation, saying (at pp. 292, 293): "The tenure of the office, by rendering the judges independent both of the government and people, is admirably fitted to produce the free exercise of judgment in the discharge of their trust. This principle, which has been the subject of so much deserved eulogy, was derived from the English constitution. The English judges anciently held their seats at the pleasure of the king, and so does the lord chancellor to this day. It is easy to perceive what a dangerous influence this must have given to the king in the administration of justice, in cases where the claims or pretensions of the crown were brought to bear upon the rights of a private individual. But, in the time of Lord Coke, the barons of the exchequer were created during good behavior, and so ran the commissions of the common law judges at the restoration of Charles II. It was still, however, at the pleasure of the crown to prescribe the form of the commission, until the Act of Settlement of 12 and 13 Wm. III. c. 2, which was in the nature of a fundamental charter, imposing further limitations upon the crown, and adding fresh securities to the Protestant succession, and the rights and liberties of the subject." Continuing, he points out that the act established that the commissions of the judges be made *quamdiu se bene gesserint*, though they were still to be removable upon the address of both branches of Parliament. The excellence of this provision, he suggests, has recommended the adoption of it by other nations of Europe such as Sweden, France and Holland.

With such a background of English tradition on the importance of an independent judiciary, the following grievance expressed against the King in the Declaration of Independence is quite understandable: "He has made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries."

The observations of Hamilton on this subject were no doubt influenced in large part by the grievance thus expressed, which was the result of bitter experience.

Whether or not the constitutional protection of judicial salaries extends to increases granted by the law-making body, has been the subject of some discussion among the text-writers. Where there has been judicial decision on this phase, it has supported the view that increases were safeguarded by the constitutional inhibi-

tion against reduction. Thus, in *Commonwealth ex rel. Hepburn* v. *Mann* (5 Watts & Serg. 403), the Supreme Court of Pennsylvania was confronted with the following problem: The salaries of the judges, by an act passed in 1839, had been increased $400. In 1843 the Legislature rescinded the increase, and the question was raised whether it had the power to do so, in view of the constitutional provision that judges were to receive an adequate compensation to be fixed by law, which could not be diminished during their continuance in office. To sustain the power of the Legislature to cancel the increase it was argued that it represented a mere gratuity. This view was rejected by the court. The decision was probably influenced by the peculiar language of the constitutional provision as it existed in Pennsylvania at the time, guaranteeing to the judges of the high courts " adequate compensation." An increase was thus regarded as an effort by the Legislature to make adequate what was previously inadequate, and, therefore, the increase was held to be within the protection of the constitutional prohibition.

It is interesting to note that in a recent case (*Long* v. *Watts*, 183 N. C. 99) the Supreme Court of North Carolina took a position in accord with the views expressed in the early Pennsylvania case, saying (at pp. 109, 110): " But it is urged that the Legislature of 1921 increased the plaintiff's salary, and, therefore, the same or any subsequent Legislature may levy a tax against it without incurring the charge of having diminished it during his continuance in office. This argument is based on the contention that by adding an additional sum, the Legislature may then tax the whole so long as the tax does not exceed the increase. Or, to state it differently, the theory of the argument is that because the Legislature thought it necessary and proper to increase the plaintiff's salary, therefore they have the right, notwithstanding the constitutional prohibition, to take it away. That the power to add carries with it the power to subtract, at least to the extent of the addition. This would entirely destroy the constitutional provision we are now considering, frustrate its purpose, and make it indeed a snare and a delusion. Any construction which tends to defeat or to nullify a fundamental principle of constitutional law, come from whatever source or quarter it may, is palpably unsound. *Commonwealth* v. *Mathues*, 210 Pa. St. 400. The Constitution is not to be so easily discarded. The moment the increase took effect it became as much a part of the plaintiff's salary as the original amount, and the whole was then protected by the constitutional prohibition against diminution. An undiminished salary is a complete salary in its entirety and not a salary less a tax."

In connection with the Pennsylvania view that an increase of

salary is not a gratuity, it is well not to be misled by illustrations borrowed from the law of contract. It is sometimes argued that a public officer, entering his office at a specified salary, may not claim an increase during his term as matter of contract, because it is not supported by consideration. But a legislative provision fixing a salary does not necessarily constitute a contract that it will not be reduced during the term of office. ( *U. S.* v. *Fisher*, 109 U. S. 143.) (See, also, *Buckbee* v. *Board of Education*, 115 App. Div. 366; affd., 187 N. Y. 544.) In the case of certain judicial officers the protection against diminution is even of a higher order than that of mere contract, being a matter of express constitutional enactment. It is, therefore, perfectly idle, in arguing about the right of the Legislature to annul an increase, to employ analogies based upon the law of contract. Whether such increases are safeguarded against impairment is solely a matter of constitutional interpretation. Perhaps the history of the provision in our State may throw light upon this constitutional limitation.

Neither the first Constitution of 1777 nor the second of 1821 contains any reference to compensation of judicial officers. Chancellor KENT (1 Comm. 295) regretfully refers to this omission. The Constitution of 1846 for the first time put into the organic law a section regarding compensation of judges (Art. VI, § 7), by providing that: " The judges of the court of appeals and justices of the supreme court shall severally receive, at stated times, for their services, a compensation, to be established by law, which shall not be increased or diminished during their continuance in office." In so far as these judicial officers are protected against reduction in salary, the clause is substantially identical with the provision in the Federal Constitution. But it goes further, in prohibiting increases as well. As those judges were then to be elected for the short term of eight years (Const. 1846, art. 6, §§ 2 and 4), the reasoning of Hamilton seems appropriate: that it would rarely happen that an adequate salary, fixed at the commencement of the term, would not continue to be adequate to its end.

A similar provision was made applicable to county judges, elected for four years (Art. 6, § 14), except that the salary was to be fixed by the board of supervisors. The same section contains a provision for the payment of a per diem allowance to justices of the peace for services in courts of sessions, without any reference to any increase or decrease of such compensation. It also provides for the establishment by the Legislature of inferior local courts of civil and criminal jurisdiction in cities; but it is completely silent as to the method of providing for or protecting their compensation.

By amendments adopted in 1869 the terms of the judges of the

Court of Appeals and of the justices of the Supreme Court were extended to fourteen years (Art. 6, §§ 2 and 13). Section 7 of article 6 of the 1846 Constitution in 1869 took the following significant form with respect to salaries: " The judges and justices hereinbefore mentioned shall receive for their services a compensation to be established by law, which shall not be diminished during t eir official terms." (Judiciary article of 1869, art. 6, § 14.)

It is to be noted that the bar upon the increases of judicial salaries was removed, obviously by reason of the lengthening of the term of the judicial officers " hereinbefore mentioned," namely, judges of the Court of Appeals, justices of the Supreme Court and judges of all other superior courts. Section 15, immediately following, granted the same protection against decreases to county judges and surrogates, without barring increases. In section 19 provision is made for the establishment of inferior local courts, and in section 26 for Courts of Special Sessions, but no mention is made of their salaries or their salary protection.

An amendment of 1894 (Art. 10, § 9) provided that " no officer whose salary is fixed by the Constitution shall receive any additional compensation. Each of the other state officers named in the Constitutition shall, during his continuance in office, receive a compensation, to be fixed by law, which shall not be increased or diminished during the term for which he shall have been elected or appointed." This amendment seems to have restored the prohibition against increases of salaries contained in the Constitution of 1846 and removed by the amendment of 1869.

The Constitution of 1894 specifically restored to the Judiciary article the prohibition against an increase during the official terms of judges of the Court of Appeals and justices of the Supreme Court. The provision is contained in section 12 of article 6, and reads as follows: " The judges and justices hereinbefore mentioned shall receive for their services a compensation established by law, which shall not be increased or diminished during their official terms." The judicial officers " hereinbefore mentioned " are again the judges of the higher courts. Sections 14 and 15, following, continue county judges and surrogates, section 15 further providing that the compensation of neither officer shall be increased or diminished during his term of office. Section 18 permits the establishment of inferior local courts of civil and criminal jurisdiction without mention of salaries and section 23 provides for the jurisdiction of Courts of Special Sessions.

In 1909 a striking amendment to section 12 of article 6 of the Constitution of 1894 was adopted. The historic clause prohibiting an increase or decrease of compensation of the judges of the Court

of Appeals and justices of the Supreme Court was eliminated, and instead the salary of the latter was fixed at $10,000 per annum, plus the additional compensation theretofore allowed to such justices by the local authorities. Contrary to first impression, the amendment did not radically change the policy of the Constitution. Its primary intent was to bring about an increase in the salaries of the justices of the Supreme Court of the Third and Fourth Departments. The total compensation of the justices of the First and Second Departments was left undisturbed, being fixed at the aggregate then allowed from State and local sources. In effect the old rule prohibiting increases and decreases was preserved. Decrease was barred by virtue of the specific salary granted by the Constitution; increase was prohibited by dint of the continued force of section 9 of article 10, which prevented an increase to an officer whose salary was fixed by the Constitution. As to the regulation of the salaries of judges of the Court of Appeals, the amendment had no effect on the bar upon increases or decreases during their continuance in office. Section 9, by prohibiting an increase or decrease, during their terms, of the salaries of State officers, whose compensation was not fixed by the Constitution, operated to prevent a change in either direction, of the compensation of sitting judges of the Court of Appeals. That this was the effect of the last-mentioned section may be gathered from an attempted constitutional amendment in 1918 of section 7 of article 6, to fix the salary of the judges of the Court of Appeals, *including those in office*, at a sum not less than the highest compensation allowed by law to any other judicial officer in the State. That amendment, if adopted, would have increased the salaries of the judges of the highest court, both those then in service as well as those thereafter elected. It failed, however, of ratification by popular vote, as did a proposed amendment in 1921 to increase their salaries to $17,500.

In 1922 a concurrent resolution was adopted by the Legislature to carry into effect the recommendations of the Judiciary Convention of 1921 for amendments to article 6. That resolution embodied a draft of the Judiciary article in substantially the form in which it was subsequently adopted as a part of the present Constitution. Upon its resubmission to the Legislature of 1924, the proposed amendment underwent certain modifications, the most important of which was the elimination of the plan to make the Court of General Sessions a city-wide court. Instead, its jurisdiction was limited to the county of New York. Another change which may have some significance in the consideration of the question before this court is the elimination of section 1 from the resolution of 1922. That section provided that " The judicial

power of the state shall be vested in the courts which are in this article expressly continued and established and in such inferior local courts as now or hereafter may exist under and by virtue of the provisions of this article." (Reported in Laws of New York, 1922, p. 1854.)

It is quite probable that this proposed section was excised out of the resolution in 1924, because it tended to establish the inferior local courts as constitutional courts. The policy expressed in that eliminated section indeed would have been inconsistent with the proposed constitutional principle embodied in section 18 of article 6, and contained both in the resolution of 1922 and that of 1924, by which the Legislature was granted power to regulate or *discontinue* " all inferior local courts now or hereafter established." The changes made in the concurrent resolution of 1924 necessitated its resubmission to the Legislature of 1925. Upon its adoption it was submitted to the people at the general election of that year, and now constitutes the present Judiciary article of the Constitution.

Concentrating our attention for the moment upon the provision for the compensation of judges, we find the following language in section 19 of article 6, which is repeated for convenience: "All judges, justices and surrogates shall receive for their services such compensation as is now or may hereafter be established by law, provided only that such compensation shall not be diminished during their respective terms of office." The changes which this amendment made in the compensation of certain judicial officers may thus be summed up:

1. The fixed salary for the Supreme Court justices was eliminated;

2. The Legislature was given full power to fix salaries of " judges, justices and surrogates," with only the limitation that the compensation should not be diminished during their terms of office;

3. The limitation existing under section 9 of article 10, prohibiting increases of salaries of State officers, no longer included within its scope judicial compensation.

After the adoption of this amendment, and beginning with 1926, the salaries of judicial officers, generally, were raised. The compensation of justices of the Court of Special Sessions, which was $10,000 up to 1926, was raised in 1927 by two successive increases, first to $12,000 and then to $17,500. The proposed reduction is to $15,040. Is such a reduction violative of section 19 of article 6? If that section applies to justices of the Court of Special Sessions, we must ascertain whether the constitutional provision prohibits the diminution of an increase in salary granted to an incumbent in the course of his tenure. True, this problem has no application to the petitioner, who entered upon his present term when the salary

of the office was already $17,500. But as it likely affects a number of other justices of that court, not similarly situated, it might seem appropriate to consider the problem from its wider aspect. Respondents, however, suggest that the compensation clause in the Constitution does not apply to justices of the Court of Special Sessions, and that they are not within its protection. If this be true, it becomes unnecessary to consider the legislative control of increases. We shall be obliged to return to it only if we find that the expression, "All judges, justices and surrogates," in section 19 of article 6 is all-embracing.

The contention of the petitioner is that the phrase used comprehends all judicial officers. The only semi-authoritative opinion supporting this view is that of the Attorney-General rendered in 1926 (Opinions of Attorney-General, 1926, p. 244). His reasoning there is somewhat meagre, but it seems to rest on the ground that for the first time in constitutional exposition there is found a complete enumeration of all the superior and inferior courts preceding the section which prohibits a diminution in compensation of " all judges, justices," etc. From this it is sought to draw the conclusion that every judicial officer mentioned in the first eighteen sections of article 6 must have been included within the guaranty contained in section 19. Petitioner reinforces this contention by pointing to the high status which Courts of Special Sessions had attained at the time the present Judiciary article was drafted, to the length of the term of the justices, and to the fact that the latter must surrender their law practice on entering upon their office. He also points out — erroneously, however — that the present Constitution for the first time makes express reference to that court and to the judicial officers presiding over it. Consequently he argues that the framers of the revised article must have had in contemplation justices of the Court of Special Sessions when, in section 19, they sought to protect " justices," among others, against a diminution of salary. Even eliminating the erroneous allusion that the new Judiciary article, for the first time in constitutional history, mentioned the Court of Special Sessions by name, the argument based upon the dignity which the court had attained as a reason for granting its justices the same protection as others, lacks cogency. It is completely demolished by two considerations, of which the first is the provision of section 18, permitting the Legislature to regulate or *discontinue* all inferior local courts. If it is urged that section 19 intended zealously to safeguard the salaries of Special Sessions justices as well as those of higher courts, how can such a position be maintained in the face of the constitutional provision for absolute legislative control over inferior local courts, of which

Special Sessions is one, even to the extent of permitting the Legislature to discontinue the latter? This legislative grant of power actually is new, established by the constitutional article of 1925. A justice of the Court of Special Sessions, therefore, enters upon his position with the possibility that the Legislature *may discontinue* his office — a far more serious contingency than the mere reduction of his salary. The second consideration which gravely impairs the force of petitioner's contention is that the proposal contained in section 1 of the concurrent resolution of 1922, whereby inferior local courts were to be made constitutional courts, was eliminated from the final draft of the Judiciary article as adopted later in 1925. It would seem, therefore, that the Constitution in protecting " all judges, justices and surrogates," intended to take under its sheltering wing only judicial officers functioning in constitutional courts, of which the Court of Special Sessions is not one.

Now let us consider the argument based upon the literal construction of the phrase. Petitioner contends that it covers all judicial officers bearing the title of " justice," including, of course, justices of his court. His chief point in support is that since section 19 follows the sections which contain a complete enumeration of all the courts, the phrase " all judges, justices and surrogates " must include jurists of every type of court theretofore mentioned. This argument is quite similar to the one resorted to by the Attorney-General in his opinion (*supra*). Reasoning based upon mere sequence or upon the theory of *post hoc ergo propter hoc* rests upon an insecure basis. Thus, petitioner would surely not include " justices of the peace," mentioned in section 17, within the salary protection of section 19 merely because the latter follows section 17. Nor could the linguistic argument bring " magistrates " within such protection, as they do not bear one of the three titles specified in the last section. Even justices of the Courts of Special Sessions are not mentioned in the Constitution by the title of " justice," the reference in section 17 being to " judicial officers holding courts of special sessions." Petitioner may urge that the title of " justice," by which those presiding in his court are designated, was well known for many years prior to the adoption of section 19, and must have been in the mind of the framers of that section. If so, why did they not refer to them in section 17 as " justices " instead of speaking of " judicial officers holding courts of special sessions? " The answer is obvious. The elasticity of legislative control over inferior local courts, granted by that section, made the permanent title of those judicial officers a matter of future uncertainty. They might, in a reorganization of the courts, even become magistrates or possibly commissioners. The only judicial

officers whose courts and titles could not be changed were those presiding over tribunals which were constitutionally created or continued.

It follows, in my opinion, therefore, that the first sentence of section 19 protects from diminution of salary only judges and justices of superior courts, as well as surrogates. If it had been the constitutional intention to make the phrase all-inclusive the term used would have been "judicial officers." If the latter had been employed it would have included judges and justices of every type of court. It is significant that where the intention is to make an all-comprehensive nomenclature the term "judicial officer" is used, as in the second sentence of section 19, which provides that "except as in this article provided, all judicial officers shall be elected or appointed at such times and in such manner as the legislature may direct." It would be strange indeed, under the circumstances, to hold that a fundamental policy with reference to salary protection, limited to constitutional courts and extending for fourscore years, should suddenly have been expanded by including within its aegis inferior local courts. To hold that such was the intent of the framers of the Judiciary article when, contemporaneously and as a new departure, they permitted discontinuance of such local courts at the pleasure of the Legislature, is to charge them with an inexplicable inconsistency.

The motion for a peremptory mandamus must, therefore, be denied.