KATHERINE A. HAGGERTY, Administratrix, etc., of JOHN J. HAGGERTY, Deceased, Plaintiff, *v.* THE CITY OF NEW YORK, Defendant.

Municipal Court of New York, Borough of Brooklyn, Seventh District, November 14, 1934.

*Harry P. Eppig,* for the plaintiff.

*Paul Windels [William R. Wilson* and *Barent Ten Eyck* of counsel], for the defendant.

CASSIN, J.   These are cross-motions for judgment on the pleadings and for summary judgment.   The facts are undisputed.

As administratrix, the widow of a justice of this court sues the city of New York for a part of his salary which she alleges it withheld from him during the year 1933 in contravention of an explicit provision of the State Constitution. The city admits the withholding, setting up chapter 637 of the Laws of New York for 1932 as its authority for so doing, denies that the decedent was one of the justices protected from diminution of compensation by the provision of the Constitution referred to, and asserts that the proceeding is *res adjudicata.* (*Matter of Gresser* v. *O'Brien,* 146 Misc. 909.) The provision is found in section 19 of article 6 of the Constitution, as amended and effective on January 1, 1926. It reads as follows: " All judges, justices and surrogates shall receive for their services such compensation as is now or may hereafter be established by law, provided only that such compensation shall not be diminished during their respective terms of office."

To arrive at a correct determination of the principles involved in this litigation, two questions must be considered: *First,* is the Municipal Court of the City of New York a constitutional court and are the presiding officers thereof constitutional officers? *Second,* irrespective of their constitutional status, are these officers included in the provision of the Constitution set forth above? I shall consider both questions somewhat in detail.

The position of the Municipal Court of the City of New York in the Constitution must first be considered because the so-called " constitutional courts " are assumed by the defendant to be the only ones protected by the provision of the Constitution under consideration (*supra*). The Constitution does not say anything about constitutional courts; the Legislature has not used that phrase or defined the constitutional status of any court; the Court of Appeals seems never to have directly decided which are constitutional courts assuming that any are properly so called. There seems to be no judicial opinion wherein any attempt has been made to list those courts that are constitutional and those that are not. The most that can be said on this mooted question is that there prevails a belief that those courts which are created or continued by the Constitution are constitutional courts and those created by the Legislature pursuant to powers delegated to that body by the Constitution are legislative courts. First, I shall seek to ascertain under which category the Municipal Court of the City of New York must be placed.

Lauer in his " Municipal Court Practice " ([1928] § 1) says: " The Municipal Court of the City of New York is a Court of ancient origin. Its history, dating back for 150 years and more, demonstrates that it is not a new local court of legislative creation, but

old local tribunals continued, consolidated, and re-organized under a new name, and adapted to the present needs of the Greater City of New York."

This is but a paraphrase of the language of the Court of Appeals in the case of *Worthington* v. *London G. & A. Co.* (164 N. Y. 81), which reversed the Appellate Division, and also overruled the contrary holding in *Matter of Schultes* (33 App. Div. 524).

Lauer further says (in § 1): " Its history will be traced through six periods and three sovereignties: Under Dutch sovereignty, from 1609 to 1664 and from 1673 to 1675; under English sovereignty, from 1664 to 1673 and from 1674 to 1780; and under New York State sovereignty, from 1776 to 1897 and from 1897 to date. Its history begins with the Town Courts, when New York was the Dutch province of New Netherland and when the jurisdiction of these courts was unlimited in amount, and recounts the changes in the court until New Netherland was ceded to Great Britain and became the English colony of New York; then until 1683 when the Monthly Courts were established for each town with jurisdiction limited in amount to forty shillings; and again until the establishment in 1780 of the Courts of the Justices of the Peace and of the Mayor, Recorder and Aldermen with jurisdiction limited to one hundred pounds; then is traced the development of the court under New York State sovereignty, noting some of the changes which the statutes of the State have wrought from time to time in the court until the enactment of the present Municipal Court Code in 1915."

A short summary of that history will be helpful. In 1780 the Legislature (Chap. 44) authorized justices of the peace, and the Mayor's Court in New York city, to try claims. By chapter 8 of the Laws of 1787 the Mayor's Court and justices of the peace were given similar powers, the former acting in the city. Any doubt that the Mayor's Court was the New York City Justice of the Peace Court was settled (Laws of 1791, chap. 12) by a law passed for the purpose of so declaring it. By chapter 20 of the Laws of 1797 the Governor was to appoint New York justices of the peace with jurisdiction similar to State justices of the peace, and two were to sit daily in the City Hall. In 1801 (Chap. 165) the jurisdiction of these New York city justices of the peace was enlarged. In 1804 (Chap. 27) the law was recast with the new name " Courts of Justice of the Peace in and for the City of New York." Assistant justices of the peace came later (Laws of 1807, chap. 139), but each Assistant's Court was given all such power " as is usual in courts of record in this State and in the same manner as the Justices of the Peace in the several counties of the State."

(The same act also created another court, which began as the "Justices Court," became the Marine Court in 1819, and later the City Court of the City of New York.)

The reorganization of 1820 (Chap. 1) again gave the assistant justice the powers of justices of the peace in the ten wards of the city, and they were made salaried officers.

These New York city justices of the peace and assistant justices were expressly continued by the Constitution of 1821 (Art. IV, § 14), their terms extended to four years, and their removal procedure indicated; they are described in terms of "the Justices of the Peace in other Counties of this State." The constitutional amendment of 1826 provided how justices of the peace should be elected. In 1827 the assistant justices were the subject of a revised statute, effective 1830, providing for their apportionment among the city wards. It was reiterated in 1828 with a recitation of the jurisdiction of the justice of the peace (2 R. S. 224, 225 *et seq.*).

In 1846 the new Constitution contained provisions for electing justices of the peace for four years and how they should be removed. In 1848 the Assistant Justices Courts were merged into the Justices Court of the City of New York (Chap. 153). In the same year the court was renamed "Assistant Justices Courts," with jurisdiction similar to that conferred upon justices of the peace, being the same court as that mentioned in section 59 of the new Code of Procedure (Chap. 379). That Code (§§ 46, 47) specified the jurisdiction of justices of the peace, and it reads very much like the equivalent provisions of the present Municipal Court Code. In 1849 (Chap. 438) jurisdiction in summary proceedings was given both to that Justices Court and to the justices of the peace in towns. Justice Lauer says (§ 6, at p. 31): "The Justices Courts of cities and Justices of the Peace possessed the same jurisdiction," citing the relevant sections of chapter 438.

In 1851 (Chap. 514) the clerk of each Justices Court in New York city acquired a seal, and a six-year term (the present terms of our clerks); each justice was to be elected for six years. In 1852 the name was changed to "District Courts in the City of New York" (Chap. 324). In 1857 the laws affecting "the district courts" in the city were codified, each court was called by its district, and jurisdiction was enlarged, with new rules; justices must now be lawyers, each court had a seal, and appeals were allowed (Chap. 344). Also there was certain criminal jurisdiction which Justice Lauer (§ 6, at p. 34) says is "usually exercised by a Justice of the Peace and committing magistrate," the rules of the Supreme Court were to apply as far as possible, and the city constables became city marshals and must live in the district.

The constitutional amendment of 1869 provided how justices of the peace and District Court justices should be elected and removed. In 1871 the power to issue warrants for certain law violations was given to any justice of the District Court of the city of New York, or any justice of the peace (Chap. 721). In 1879 jurisdiction in summary proceedings was given to justices of the peace and, *inter alia*, justices of the District Court of the city of New York (Chap. 101). In 1880 the Civil Code provisions as to " Justices Courts, or Courts of a Justice of the Peace, and the District Courts of the City of New York " became effective; the former including Brooklyn, Queens and Richmond, the latter, New York county. The courts were continued with their old jurisdiction and powers, but the procedure was somewhat altered. The Consolidation Act of the city of New York (1882) repealed the provisions governing District Courts in Manhattan, recognizing their 1877 jurisdiction and powers.

The 1894 Constitution again provided for the election of justices of the peace every four years and contained in addition this provision, " Justices of the Peace and District Court justices may be elected in the different cities of this State " in the manner provided by law; also that no new courts of record shall be created. This is a rapid summary of the history of the New York County and New York City Justices of the Peace Court in its various forms for a period of over a hundred years ending with 1897.

The county of Kings contained for many years Brooklyn and other separate communities. Each of the towns had its own justice of the peace pursuant to the constitutional provisions, although these justices antedated the Constitution as did all justices of the peace throughout the State. In 1827 the laws relative to the village of Brooklyn were consolidated and what had been the Justices of the Peace Court became the Municipal Court. They were invested with " all and singular the powers of Justices of the Peace for the County of Kings " (Laws of 1827, chap. 155). It was a court of record with a seal and had power to try all matters " now cognizable before a single Justice of the Peace within the limits of the said village."

In 1830 this status was recast (Chap. 79), repeating that the Municipal Court in the village of Brooklyn had all the powers of justices of the peace in any town in the county. When the Code of Procedure was passed in 1848 it recognized the Municipal Court of Brooklyn (§ 9) and it reiterated the grant of jurisdiction such as was possessed by courts of justices of the peace. In 1849 (Chap. 125) a general act covering Brooklyn was passed. The city of Brooklyn was divided into court districts, in each of which

a justice of the peace should be elected every four years who had the same jurisdiction in the said city as justices of the peace had in towns and that they should be justices of the peace of the county of Kings. It was expressly provided that they should have jurisdiction of summary proceedings to the same extent as the assistant justices across the river in the city of New York then had. The name was changed and it was no longer called the Municipal Court. In 1871 the jurisdiction of the justices of the peace of the city of Brooklyn was extended (Chap. 492). In 1880 the city of Brooklyn was divided into judicial districts and the successors of the existing justices of the peace then in office were to be elected (Chap. 256). In 1883 this act was amended again providing that justices of the peace of the city of Brooklyn should have power and jurisdiction and perform such duties " as were designated by the code of criminal procedure and the code of civil procedure," and that they were to exercise and perform the duties of justices of the peace (Chap. 256). That gives the history of the court which existed in Brooklyn at the time of the consolidation. The fact that they were generally spoken of as Justices Courts does not alter the fact that they were the constitutional court known as justices of the peace.

In what is now the borough of Queens there had been also many separate communities, all of which were towns and villages, and in 1870 Long Island City was incorporated, Newtown was added to it and the act provided (§ 719) for the election of two justices of the peace in the city. These justices were to have the same jurisdiction as justices of the peace in towns. This seems to have been the situation in 1897.

Greater New York came into existence by law in 1898 and all these communities were consolidated. " The Justices Courts and the office of Justice of the Peace in the Cities of Brooklyn and Long Island City " were abolished; their powers, etc., were transferred to the Municipal Court. Likewise, the District Courts in Manhattan, known as the District Courts of the City of New York, were continued, consolidated and reorganized under the new name. All these local courts in three counties, namely, the Justices Court in Brooklyn and the justices of the peace in other parts of Kings county, and the District Court in New York county and the Justices Courts in Queens county were all succeeded by the Municipal Court.

Justice Lauer says on this point: " The question was subsequently presented to the Courts whether the Municipal Court as thus consolidated and reorganized was a continuation of the old courts under a new name or the creation of a new local inferior

court." He says that the answer to that was given by the Court of Appeals in the *Worthington Case* (164 N. Y. 81) wherein many contrary holdings were reversed and it was held that it is not a new court but old tribunals continued, consolidated and reorganized under a new name. The meaning of this, of course, is that the Municipal Court as it now exists is made up of the welding together of at least three courts, namely, the Justice of the Peace Courts outside of the cities in the three counties, the Justice of the Peace Court in the city of Brooklyn, and the differently named Justice of the Peace Court in Manhattan, namely, the District Court. Tracing the District Court back it is soon seen to be the Justices of the Peace Court so that, really, the Municipal Court of today is made up of this group of Justices of the Peace Courts with a new name. No one has ever suggested that a Justice of the Peace Court is not a constitutional court. That is not necessary of discussion because throughout all Constitutions since 1777 the Justice of the Peace Court has been expressly recognized and named in the Constitution and if there were any doubt about its status it has been expressly held to be a constitutional court. It is the undoubted holding of *Beach* v. *Baker* (25 App. Div. 9) and *People ex rel. Burby* v. *Howland* (155 N. Y. 270, affg. 17 App. Div. 165) that the justice of the peace is a constitutional officer and that prior to the latest amendment to the Constitution it could not be abolished by the Legislature. If, therefore, to be protected by the constitutional salary provision justices must be members of a constitutional court it would seem evident that the justices of the Municipal Court have exactly that status. This 1897 status of the Municipal Court continued until 1915 when it was reorganized without change of name or powers and was made a court of record. The reason it could be made a court of record was that it was not a new court. The Legislature has not had power for almost a century to make new local courts and make them courts of record. The provision in the 1915 reorganization that this court was to be a court of record is, therefore, proof of the fact that it is not a new court. (*Matter of Levy*, 192 App. Div. 550; *Matter of Markland* v. *Scully*, 203 N. Y. 158; *Matter of Hottenroth* v. *Flaherty*, 61 Misc. 108.) In 1925, when the whole judiciary article was elaborately recast, the Municipal Court was for the first time named specifically in it and in two sections justices of the Municipal Court were specified. Section 17 of article VI specifically provides for the method of removal of these justices, and for the first time the Municipal Court then entered into the Constitution by name, and was expressly made the subject of a constitutional provision as to it. In *Matter of Adler* v. *Voorhis* (254 N. Y. 375) the Court of Appeals said that

our justices are "members of the judicial system of the State." In their older decision (*Whitmore* v. *Mayor*, 67 N. Y. 21) they went so far as to say that a clerk in our court "is a judicial officer, embraced within the judiciary system of the State." In *Ledwith* v. *Rosalsky* (244 N. Y. 405) they said that judicial officers in courts of limited geographical jurisdiction are "part of the judiciary system of the State." In *Matter of Richards* (179 App. Div. 823; affd., 221 N. Y. 684) the Appellate Division said that "the office of Justice of the Municipal Court of the City of New York is an office in the judicial system of the State." Justice COHALAN said in the *Schneider Case* (94 Misc. 481, at p. 485) that the courts hold "that an attache of a court or of its clerk's office is not a part of the city government, but is part of the judicial system of the State. (*Whitmore* v. *Mayor*, 67 N. Y. 21; *Quinn* v. *Mayor*, 44 How. Pr. 266; affd., 53 N. Y. 627; *Taylor* v. *Mayor, etc.*, 67 id. 93; *Stewart* v. *Mayor*, 15 App. Div. 548; *People ex rel. Gilchrist* v. *Murray*, 73 N. Y. 535.)"

If the justices of the peace and the Justices of the Peace Courts are constitutional officers and constitutional courts, and if the Municipal Court is made up of the combined Justice of the Peace Courts regardless of how they were named in cities and is the continuation of those courts under another name then any constitutional provision applicable to constitutional courts is applicable to the Municipal Court of the City of New York. The history of the justice of the peace and his court, as recorded in the *Howland Case* (155 N. Y. 270), contains the statement that it was "established by the Constitution." The court also states that since the court was well known when the Constitution was adopted "it is presumed that the framers thereof and the people meant to establish it as an office."

In *People ex rel. Wogan* v. *Rafferty* (208 N. Y. 451) the court indicated that when the Constitution recognizes an existing office that recognition takes it out of the power of the Legislature to reduce its functions; the opinion fairly indicates that a constitutional status is given to an office when "the Constitution * * * recognizes its existence." It would seem to be unnecessary to discuss that question further.

The case of *Koch* v. *Mayor* (152 N. Y. 72) is probably the first to refer to courts in terms of their constitutional status. The office of police justice of the city of New York, which seems to have been created by the Legislature in 1848, was before the court because of an attempt to abolish it. The court said that the judiciary article amendment of 1870 did not make the office of police justice a constitutional office, and Judge VANN seemed to stress the fact that of the

" many inferior local courts * * * and judges or justices cf inferior courts not of record, created by statute and in existence at the time the Constitution was adopted, not one of them is continued *eo nomine*." That cannot be said today of the Municipal Court. Whether or not the office of police justice, which was not then specified in the Constitution, could be abolished by the Legislature did not require any decision as to which other courts in the State are constitutional courts, and whatever was said in the opinion beyond that point is, therefore, dicta. His remark that the 1894 Constitution continued " four great courts " does not indicate that they are the only four State courts. Justices of the peace were surely continued and were statewide. The four that he speaks of, namely, the Court of Appeals, the Supreme Court, the Surrogates and County Courts exist in every part of the State. As the revised form of the oldest court in the State, this court, which has its statewide counterparts, would seem to be just as much a great court as the County Court, which is separate in each county from the County Court of of every other county.

In the latest ruling of the Court of Appeals (*Matter of Burke* v. *Cohen*, 265 N. Y. 210) the old rule that only elective officers created by the Constitution came under article 10, section 5, was abandoned. Hereafter the rule will be that all elective city officers are included. The opinion does, however, continue the distinction between " vacancies in offices created by the Constitution and vacancies in other city offices."

Until a contrary ruling is made, we must assume that the rule laid down in *People ex rel. Deitz* v. *Hogan* (214 N. Y. 216) and *Needleman* v. *Voorhis* (254 id. 339) is still in force. In those cases it was held that aldermen and presidents of the boroughs were constitutional officers because they perform a duty imposed upon them by the Constitution. Judged by that standard, it can hardly be maintained that an officer who passes judgment upon the personal and property rights of the people and has the power to enforce his mandates is other than a constitutional officer for the power reposing in him was delegated by the Constitution.

The fact of the matter is that the rule dividing officers into constitutional and non-constitutional categories has created " constant doubt." The importance of the distinction has not always been evident, just as the importance of the alleged distinction between constitutional and non-constitutional courts is not evident. The fact that the Constitution does not create the distinction may very well be the reason why the court has decided not to follow this extra-constitutional creation any further. The court had plausible grounds for holding that the comptroller of the city of

New York was a constitutional officer, but instead of doing that, it has abandoned, apparently, the entire theory. It can be said that the theory never was sound, but it is just as sound as the alleged distinction between constitutional and non-constitutional courts. It is not unfair to say that the language used by the Court of Appeals in deciding the comptrollership question means that the law, which aims to grow with the times, now is that there is no sound foundation for the distinction, no constitutional ground for making it, and that, in spite of the fact that the People have had abundant opportunity to insert that distinction in the Constitution during its various amendments, they have never done so. If distinctions are not in the Constitution, even by implication, they should not be read into it at this late day, and the Court of Appeals has abandoned any attempt to apply the alleged distinction any further. It seems like a solution of an increasingly embarrassing position to make the sensible declaration that there is no reason why that artificial position should be held any longer. The same rules of common sense would forbid the injection into the Constitution of the baseless idea that there are two classes of courts. In spite of all the changes that the People have made in article 6 of the Constitution since 1845 they have never added language that was even susceptible of that construction, or conveyed that distinction by indirection. It is entirely an extraconstitutional creation, never appearing in any constitutional amendment, and resting for its existence, recognition or importance upon *dicta*.

We come now to the second question. It would seem to one not versed in the intricacies of the law, to one who knew that the late Justice HAGGERTY was nominated and later elected as a justice of this court, that he was addressed by attorneys who appeared before him as such or its equivalent " Judge," that he was referred to by appellate courts by that title and whose title was set forth on the payrolls he signed, that there would be little if any doubt as to whether or not he was included under the terms of the aforementioned sentence.

There are two schools of interpretation of words and phrases and sentences. The first is the layman's. It states that a word, etc., should be given the meaning ordinarily given to it at the time of use. This interpretation was adopted by the Legislature when it enacted the following (Gen. Construction Law, § 26): " The term ' judge ' includes every judicial officer authorized, alone or with others, to hold or preside over a court of record. It also includes a justice, surrogate, recorder, justice of the peace or other judicial officer authorized or required to act or prohibited from

acting in or with respect to the matter or thing referred to in the provision where that word is used."

The second is the school of judicial interpretation. It seeks to ascertain not what the makers of substantive or adjective law say but what they mean. The reports are replete with examples of this kind of interpretation. To go no further than those which are of passing interest to the justices of this court let me cite *Matter of Levy* (*supra*) and *Matter of Moore* (125 Misc. 607).

This court is fortunate in having three opinions interpreting this sentence to guide it in arriving at its own determination. It is unfortunate in that they do not agree. One (*Matter of Black*, not reported) I shall not discuss for the reason that it does not address itself to the meaning of the sentence in question and is based upon reasoning that does not appeal. The second (*Matter of Summers* v. *Eckert*, 149 Misc. 27) is in accord with the views of this court and may be considered as part of its reasoning. The third (*Matter of Gresser* v. *O'Brien*, *supra*) is an excellent example of the so-called judicial interpretation of the written word.

The *Gresser* case dealt with an application for a writ of mandamus by a sitting justice of the Court of Special Sessions to compel the city of New York to return to him a certain part of his salary withheld under the same authority as that by which the plaintiff's husband's salary was diminished. The relief sought in both instances is the same; the means are different. In the *Gresser* case a discretionary remedy was involved (*Matter of Black* v. *O'Brien*, 264 N. Y. 272); in the instant case an action at law was begun.

Because of the fact that a view prevails, erroneously, I believe (*Matter of Black* v. *O'Brien*, *supra*), that the Court of Appeals adopted its reasoning in affirming the order denying a writ of mandamus (*Schieffelin* v. *Goldsmith*, 253 N. Y. 243, 250), and further because the present Attorney-General reversed a ruling by one of his predecessors with respect to the legality of taxation of salaries of justices of this court, apparently on the conclusions of this opinion, I am constrained to analyze it and point out what I consider its unsound assumptions.

The meat of the argument is found in the first two sentences of the last paragraph. They state: " It follows, in my opinion, therefore, that the first sentence of section 19 protects from diminution of salary, only judges and justices of superior courts as well as surrogates. If it had been the constitutional intention to make the phrase all-inclusive the term used would have been ' judicial officers.' " (*Matter of Gresser* v. *O'Brien*, *supra*, at p. 922.) Taking the second sentence first, a fair reading would have you

believe that where the framers of the article in which this section is found use, the term " Judicial Officers " they use it to include judges and justices of every court, superior and inferior. Is this the fact? The term is used in the second sentence of section 9 of article 6 of the Constitution and refers to county judges, surrogates, judges of the Court of General Sessions and justices of the City Court; in the third sentence of section 9 and refers to all the above-named officers and judges of the Court of Appeals and justices of the Supreme Court; in the fourth sentence of section 10 and refers to all the above-named officers; in the sixth and seventh sentences of section 17 and refers to justices of the peace, justices of the Municipal Court of the City of New York, judges and justices of inferior courts not of record; in the second sentence of section 19 and refers to all judicial officers except those otherwise provided for (referring to county judges), and finally in the eighth sentence of this section and refers to all judicial officers except a justice of the peace.

One can thus see that far from being an " all-inclusive term " the framers of the amended article ran the entire gamut of the judiciary and used the term to suit the needs.

We come now to the first sentence of the quotation. It sets forth in sweeping terms the conclusion of the learned court that only judges and justices of superior courts are protected by the first sentence of section 19. It might be asked at this point what is the difference between a superior and an inferior court and further which are the so-called superior courts. As I understand the word, superior is used with reference to the jurisdiction a court exercises. Judged by that standard, the Supreme Court is the only trial court that is superior. All others are inferior.

It would extend this opinion unduly to follow step by step the detailed history of the subject of compensation of judicial officers in the Constitutions since 1846. It is sufficient to state that I concur with the *Gresser* opinion when it asserts that all such salary provisions refer to the judicial officers of certain courts and not to those of other courts including the justices of the Municipal Court of the City of New York. And the reason for this is apparent. The reference to compensation always was included in the section or sections dealing with the particular court. Thus there was no ambiguity as to the meaning of the authors of these provisions. But when it goes on to say that since in previous Constitutions the compensation of the judicial officers of only certain courts was considered it follows that the reference to compensation in the present article refers only to those officers the conclusion must be challenged.

To one who has had the opportunity to examine the various drafts of the article (there were ten in all) as it was being fashioned, the intent of the framers is clearly apparent. Following the method employed since 1846, the various drafts attempted to fix the compensation of the judicial officers of different courts, particularly the judges of the Court of Appeals and the justices of the Supreme Court. In one draft the compensation would be fixed only to be eliminated or changed in the next. But, and this is extremely important, the proposed compensation appeared in the section dealing with the particular court.

In the eighth draft the reference to the compensation of judges of the Court of Appeals and justices of the Supreme Court was eliminated although attempts to fix the compensation of the judicial officers of other courts still continued. In the ninth draft the present sentence of section 19 for the first time appears and is carried over to the final draft as it was submitted to the Legislature and finally ratified by the People.

Which brings us to a discussion of section 19, the importance of which grows the more it is examined. No such section ever appeared in a Constitution before. It is an omnibus section; it deals with a variety of subjects and even places limitations on district attorneys, whom no one will say are judicial officers as that term is ordinarily understood. And its position in the article is deeply significant. Let me quote Mr. Justice NOONAN on this point (*Matter of Summers* v. *Eckert, supra*): " The language of the present provision, ' All judges, justices and surrogates,' is all-inclusive, and in view not only of the meaning of the words used standing alone, but also in view of the reframing of the judiciary article and the rearrangement of its provisions so as to bring the section relating to the establishment of inferior courts to a position in advance of the compensation provision, I am clearly of the opinion that the compensation provision is intended to apply to all judges whether they be judges of courts continued or created by the Constitution, or judges of courts created by the Legislature pursuant to constitutional authority."

Or to put it differently and from a higher authority (Judiciary Constitutional Convention of 1921, Report to Legislature, Jan. 4, 1922, Leg. Doc. 1922, No. 37, § 19, p. 29): " A number of *general* provisions are consolidated in the new section 19, which were heretofore in other sections, and which method rendered it difficult to ascertain readily the various constitutional provisions applicable to *all* judges. * * * The compensation of judges should, in the judgment of the present convention, be left entirely to the legislature, which after all is the body always directly in touch

with and responsible to the people. It is not a proper subject to be dealt with in a constitution." (Italics mine.)

Against a conclusion arrived at by a series of inferences and assumptions stands the inescapable fact that for the first time since the Constitution of 1821 the attempt to fix the salaries of judicial officers of any court in the Constitution was abandoned and it was left entirely to the Legislature provided that the compensation so fixed should not be diminished during the term of office.

No words of limitation preceded or succeeded the words, " Judges, justices and surrogates." Neither was the prohibitory clause placed in or immediately succeeding the sections dealing with the courts heretofore protected. Rather it is placed in a " new " section with " a number of general provisions " " applicable to all judges."

I am aware that it may be said that *Matter of Moore (supra;* affd. on opinion of the lower court, 215 App. Div. 655) concerned the interpretation of a sentence somewhat similar to the first sentence in section 19. The sentence reads: " No person shall hold the office of Judge or Justice of any court longer than until and including the last day of December next after he shall be seventy years of age." It was held that this did not apply to the justices of the Municipal Court of the City of New York.

The same process of reasoning employed in the *Gresser* case is found in the *Moore* case. The historical antecedents of the clause are first studied and again the learned justice finds that the words " judge." and " justice " apply only to the judicial officers of certain courts. Again, I am in accord with the result attained. And for the same reason that I approved that process of reasoning in the *Gresser* case, namely, that the clause of limitations of age is found among or in the sections the judicial officers of which are affected. As the opinion states (p. 610): " In that instrument [referring to Constitution of 1894] sections 1–13 are devoted to the Court of Appeals and the Supreme Court, and section 12 contains the seventy-year age limitation applying to persons holding ' the office of Judge or Justice of any court.' But the comprehension of that phrase is quite evident now. It refers only to judges of the Court of Appeals and the justices of the Supreme Court. This becomes fully apparent from the fact that the age limit for county judges and surrogates is for the first time specifically provided for in section 15 of the same article. If it were covered by section 12, the language of section 15 would be a needless repetition, at least so far as the office of county judge is concerned." (*Matter of Moore, supra,* at p. 610.) And again: " Section 17 of article 6 of the State Constitution provides for justices of the peace and District

Court justices, without any mention of an age limit for these judicial officers." (Id. p. 611.)

In section 19 of article 6, as amended (1926), appears this sentence: " No person shall hold the office of judge or justice of any court or the office of surrogate longer than until and including the last day of December next after he shall be seventy years of age." This is the same phraseology used in section 12 (Constitution of 1894) except the addition of the words " or the office of surrogate." It would appear that it is the old sentence with the additional phrase, transposed to the new section 19. But this is not so. At least it appears not to be the fact since it appears in the Concurrent Resolution of 1925 as new matter. (Cf. Concurrent Resolution adopted Mar. 27, 1925, but not as published in Laws of New York, p. 1150.)

In other words, the framers of the revised article did with the provisions relating to age limitation what they did with the provisions relating to compensation. They removed them from the sections dealing with particular courts and consolidated them in a new section appearing after the sections relating to all courts and all judicial officers. For this and other reasons which need not here be considered, I hold that while the reasoning in the Moore case can be upheld, an analogous situation since the adoption of the amendment of 1926 might well be subject to further review.

In the original Concurrent Resolution adopted in 1922 there was a section (§ 1) which reads as follows: " The judicial power of the State shall be vested in the courts which are in this article expressly continued and established and in such inferior local courts as now or hereafter may exist under and by virtue of the provisions of this article." Subsequently in 1924 this with other matter was eliminated. The Gresser opinion commenting on this elision states (at p. 919): " It is quite probable that this proposed section was excised out of the resolution in 1924, because it tended to establish the inferior local courts as constitutional courts." If such was the tendency or intention of this section it was not referred to in the report to the Legislature (Report to Legislature, supra, pp. 9–13). Far from being the probability, the reasons for the inclusion of this section are set forth with earnestness and lucidity in the report. And if we may assume that such was the intention, the excision failed of its purpose for the Court of Appeals has stated: " For the first time in the history of the State a place is now given in the Constitution itself to inferior local courts in cities or parts of cities." (Matter of Adler v. Voorhis, supra.)

There is a device in logic which destroys an argument by demonstrating its absurdity if followed to a logical conclusion.

It is used in the *Gresser* opinion (p. 921) and attacks the argument that the petitioner is in fact and in law a " justice." This would not concern the present question were it not for a statement contained therein. It concludes: " The elasticity of legislative control over inferior local courts, granted by that section, made the permanent title of those judicial officers a matter of future uncertainty. They might, in a reorganization of the courts, even become magistrates or possibly commissioners. The only judicial officers whose courts and titles could not be changed were those presiding over tribunals which were constitutionally created or continued."

This observation applies to the Municipal Court of the City of New York which is admittedly an inferior court. Assume to prove the point, that the Legislature did change the title of the presiding officer of this court to " commissioner." What then of sections 9 and 17? Would the specific reference to " justices of the Municipal Court of the City of New York " in these sections continue to apply or would it thereafter have no meaning? Would it mean that the Appellate Division on the signing of the bill would lose its jurisdiction to entertain and dispose of charges presented against a justice of the Municipal Court of the City of New York (*Matter of Levy, supra*), or would it mean that for one purpose (punitive) they were justices and for another (protective) they were commissioners? (Cf. Supplemental Report of the Executive Committee Judiciary Constitutional Convention of 1921, Leg. Doc. 1922, No. 67, pp. 5, 6.)

I have referred at times in this opinion to historical antecedents and the propriety of interpreting the present from a study of the past. But this process of reasoning must not be used where the subject under scrutiny is new matter. Such was section 19 because it was submitted to the people as new matter. (Const. art. XIV; Election Law, § 70.) To hold otherwise would be to admit that a conscious or unconscious fraud was perpetrated upon the people and I, for one, am not at this time ready to subscribe to this belief.

I have stated above that section 19 is an omnibus clause, that it deals with a variety of subjects and relates to all judges. The last is not exactly the fact. What should be said is that it deals with all judges unless a restrictive phrase or particular courts are cited. Consider the first and ninth sentences. In those two sentences is the answer to this entire problem. The first is all-inclusive. The ninth is restrictive. It states explicitly which officers come within the purview of the sentence. They are set forth court by court. They embrace that group loosely termed " constitutional courts." If the framers of the article intended

to protect from diminution the compensation of the officers of these courts only, why did they not use the same phraseology in the first sentence? The question answers itself.

One more point remains to be considered. The statement that "The only judicial officers whose courts and titles could not be changed were those presiding over tribunals which were constitutionally created or continued." That is a broad statement where it states a title could not be changed. It presumes that the title was given by the Constitution. That is not the fact. All titles are given by implication including the title of the presiding officers of this court. Nowhere in article 6 can you find the mandate that the presiding officer of any court shall be called thus or so.

After all why so much made of a title? Why a "judge" of the Court of Appeals and a "justice" of the Supreme Court; a "judge" of the County Court and a "justice" of the City Court? Is it not better to heed the mandate of the law (Gen. Construction Law, *supra*) and look behind the title to the office?

I have excellent, if extrajudicial, authority for many of the views herein set forth, for do not the records disclose that Ex-Judge LAUGHLIN and Ex-Justice KENEFIC were of counsel respectively for the petitioners in the *Gresser* and *Summers* proceedings? These distinguished members of the bar were members of the Judicial Convention that submitted the amended article to the Legislature. Fortified by the knowledge that I but concur with their views, my duty, at no time a pleasant one because of the personal interest I may have in this litigation, becomes less onerous and I shall not be charged I hope with making the wish father to the thought.

I believe that I am on firm ground when I espouse the beliefs of these gentlemen. I believe they knew whereof they spoke when they gave their views of the meaning of the section and the sentence under consideration. Surely it will not be asserted they were not in part authors of the words and phrases to be interpreted.

It might be well for those charged with the interpretation of the Constitution that they read the article entitled " Constitutional Interpretation," preceding the Constitution in 2 McKinney's Consolidated Laws, where it says (Sec. 7): " Ordinarily the words of the constitution must be taken to mean what they most directly and aptly express. They must be given their usual, ordinary, and popular significance, and not a vague and general sense. * * * The principle that the words of a written instrument should be construed in accordance with their usual and literal meaning, applies with more than usual force to the words contained in a constitution, inasmuch as they were presumably adopted with the utmost deliberation. * * * Also, the convention in

framing the constitution, and the people in adopting it, must be assumed to have in mind in the use of its terms the meaning which had been given to those terms before they were inserted in the constitution. * * * Similarly, a term will be deemed to have been used in the sense it had acquired from long legislative usage."

Chapter 637 of the Laws of 1932 is unconstitutional in so far as it empowered the defendant to reduce the decedent's compensation.

The plaintiff's motion is granted and the defendant's is denied.